IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 1, 2024

## IN RE KEIRA F. ET AL.

**Appeal from the Juvenile Court for Davidson County
No. PT265992        Sheila Calloway, Judge**

_____

### No. M2023-01184-COA-R3-PT

_____

A mother appeals a juvenile court's decision to terminate her parental rights to two of her children based on three statutory grounds. She also challenges the juvenile court's finding by clear and convincing evidence that termination of her parental rights was in the best interests of the children. Discerning no error, we affirm the juvenile court's termination of the mother's parental rights.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CARMA DENNIS MCGEE and KRISTI M. DAVIS, JJ., joined.

Clayton Michael Cardwell, Nashville, Tennessee, for the appellant, Tara J.

Jonathan Skrmetti, Attorney General and Reporter, and Mara L. Cunningham, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

This appeal concerns the termination of Tara J.'s ("Mother") parental rights to two of her children, Keira and Kaylee.[1] The Tennessee Department of Children's Services ("DCS" or "the Department") became involved with the family in 2017 after receiving a report of domestic violence and substance abuse in the home. In January 2018, DCS learned that Mother was allowing Keira's father, Nicholas F.[2] ("Father"), to live in her

_____

[1] Mother has three other children who have been removed from her custody, but those children are not at issue in this case.

[2] Mother identified Randall F., Jr., as Kaylee's father; he is deceased.

home despite a restraining order that prohibited Father from having contact with the children. Thereafter, the children were removed from Mother's physical custody through an immediate protective agreement. The children were returned to Mother's custody in June 2019, and DCS closed the case. The restraining order against Father remained in effect, however.

Unfortunately, there continued to be issues in the home. In April 2020, law enforcement responded to Mother's home due to a physical altercation between her and Father. After arriving at the home, law enforcement observed that Father had visible injuries and that there were "crushed up white powdery substances" in Mother's bedroom. The responding officers arrested Mother for domestic assault with bodily injury; she bonded out.

Following this incident, DCS received a referral alleging that the children were drug-exposed, lacked supervision, and suffered from environmental neglect. The Department investigated the matter and learned that Keira was in Father's care. He consented to a drug screen that returned positive for several controlled substances. When Father could not provide prescriptions for all of these substances, DCS removed Keira from his custody and filed a petition for an emergency protective custody order alleging that the child was dependent and neglected. The juvenile court entered an order on April 20, 2020, granting the petition and placing Keira in the temporary custody of DCS.

Father claimed that Kaylee[3] was in Mother's care, but DCS could not locate her or Mother. Mother appeared in court on April 20, 2020, for the hearing on the petition for an emergency protective order regarding Keira, and DCS learned that Mother had left Kaylee in the care of the child's "godfather." Two days later, DCS removed Kaylee from the home and filed a petition seeking custody of Kaylee alleging that she was also a dependent and neglected child. On April 24, 2020, the juvenile court entered an order placing Kaylee in the temporary custody of DCS. The juvenile court adjudicated both children dependent and neglected in an order entered on December 15, 2020.

The Department filed a petition to terminate Mother's parental rights to both children approximately a year and a half later on September 22, 2021. The juvenile court conducted the first two days of the termination hearing on May 12 and 13, 2022. Due to several continuances, the termination hearing did not resume until May 15 and 17, 2023, and concluded on June 1, 2023. On July 26, 2023, the court entered an order terminating Mother's parental rights. The court determined that the following grounds for termination had been proven by clear and convincing evidence: (1) abandonment by failure to support, (2) persistence of conditions, and (3) failure to manifest a willingness or ability to care for

---

[3] The child's name also appears in the record as "Kaylie." We use the spelling used by both parties in their appellate briefs.

the children. The court further determined that there was clear and convincing evidence that termination of Mother's parental rights was in the children's best interest.

Mother appealed and presents the following issues for our review: whether the juvenile court erred in finding by clear and convincing evidence that grounds existed to terminate her parental rights and whether the juvenile court erred in determining that termination of her parental rights was in the best interest of the children.

## STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 249-50 (Tenn. 2010) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Although this right is fundamental, it is not absolute and may be terminated in certain situations. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has identified "'those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B., IV.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)).

Tennessee Code Annotated section 36-1-113 provides the grounds and procedures for terminating parental rights. First, a petitioner seeking to terminate parental rights must prove that at least one ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. Second, a petitioner must prove that terminating parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The termination of a parent's rights is one of the most serious decisions courts make because "[t]erminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, 2005 WL 1021618, at *6, "and of 'severing forever all legal rights and obligations of the parent or guardian.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(l)(1)). Consequently, a parent has a constitutional right to fundamentally fair procedures during termination proceedings. *In re Hannah C.*, No. M2016-02052-COA-R3-PT, 2018 WL 558522, at *2 (Tenn. Ct. App. Jan. 24, 2018) (citing *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016)).

Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d at 522. Before a parent's rights may be terminated, a petitioner must prove both the grounds and the child's best interest

by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

We review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B.*, 2014 WL 2168553, at *2. In light of the heightened standard of proof, we must then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)).

ANALYSIS

## I. Termination Grounds

### A. Abandonment by failure to support

A parent's rights may be terminated for abandoning his or her child. Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102(1)(A) provides several definitions of "abandonment," but only the definition provided in subsection (i) is relevant in this case. At the time the termination petition was filed, subsection (i) defined "abandonment" as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents . . . either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i) (effective July 1, 2021, to May 8, 2022).

Thus, under this definition of abandonment, a parent's parental rights may be terminated for failing to visit and/or failing to support his or her child in the four months immediately preceding the filing of the termination petition. In this case, the juvenile court determined that Mother abandoned the children by failing to support them during the relevant time period. A failure to support occurs when a parent fails, "for a period of four (4) consecutive months, to provide monetary support or [fails] to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D) (effective

- 4 -

July 1, 2021 to May 8, 2022). "Token support" is "support, under the circumstances of the individual case, [that] is insignificant given the parent's means." *Id.* § 36-1-102(B). Because DCS filed the petition to terminate Mother's parental rights on September 22, 2021, the relevant four-month time period for determining whether Mother abandoned the children by failing to support them under Tenn. Code Ann. § 36-1-102(1)(A)(i) is May 22, 2021, to September 21, 2021. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (holding that the applicable four-month time period for determining whether a parent has willfully failed to support is "the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed").

In concluding that DCS proved this ground by clear and convincing evidence, the juvenile court found that Mother paid no child support during the relevant four-month period. Mother contends that this finding, by itself, does not constitute clear and convincing evidence that she abandoned the children by failing to support them. According to Mother, the juvenile court needed to "delve deeper into the Mother's means to pay support during the relevant four-month time period" to determine whether the failure to support was "insignificant." To support this argument, Mother relies on the definition of "token support" set forth above and on the caselaw pertinent to that definition. A thorough review of the record, however, shows that the evidence does not preponderate against the juvenile court's finding that Mother was employed but failed to pay any support during the relevant time period. Indeed, Mother paid no child support throughout the custodial episode despite knowing of her responsibility to pay child support because that responsibility was explained in her permanency plans and in the criteria and procedures for termination of parental rights document that was read to her on June 15, 2020, April 12, 2021, and June 10, 2021.[4] Tennessee Code Annotated section 36-1-102(1)(D) expressly states that it is no defense "[t]hat the parent had only the means or ability to make small payments . . . if no payments were made during the relevant four-month period." Thus, under the circumstances of this case, the juvenile court was not required to make a finding that Mother's failure to pay any support was insignificant given her means.[5] In light of

---

[4] The record contains evidence showing that Mother provided dinner and some gifts to the children during visits, but she had no visits during the relevant four-month period.

[5] We acknowledge that "absence of willfulness" is an affirmative defense to abandonment for failure to support. Tenn. Code Ann. § 36-1-102(1)(I). "Such defense must be established by a preponderance of the evidence," should be pled "pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure," and "[t]he parent . . . shall bear the burden of proof that the failure . . . to support was not willful." *Id.* As Mother filed no answer to the petition to terminate, she failed to plead lack of willfulness as an affirmative defense pursuant to Tenn. R. Civ. 8.03. *See* TENN. R. CIV. P. 12.08 (specifying that, in general, defenses not raised by motion or answer are waived); *see also In re Ashlynn H.*, No. M2020-00469-COA-R3-PT, 2021 WL 2181655, at *4 (Tenn. Ct. App. May 28, 2021) (finding a father who failed to plead the absence of willfulness in his response to the petition to terminate parental rights waived it as a defense to the ground of abandonment by failure to support). Furthermore, a thorough review of the record reveals no proof that such a defense was tried by the parties' express or implied consent. *See* TENN. R. CIV. P. 15.02 (providing

Mother's failure to make any support payments during the relevant time period, we conclude that the juvenile court properly determined that clear and convincing evidence established this termination ground.

## B. Persistence of conditions

The juvenile court also terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3). This ground is often referred to as "persistence of conditions" and allows courts to terminate parental rights in situations where:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> > (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
> >
> > (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
> >
> > (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A). A petitioner seeking to terminate parental rights pursuant to this ground must prove each of the statutory elements by clear and convincing evidence. *In re Justin D.*, No. E2019-00589-COA-R3-PT, 2020 WL 4473032, at *9 (Tenn. Ct. App. Aug. 4, 2020) (citing *In re Michael B.*, No. M2019-01486-COA-R3-PT, 2020 WL 2988932, at *10 (Tenn. Ct. App. June 4, 2020)).

The persistence of conditions ground "focus[es] on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d at 874. The purpose behind this ground for termination is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re*

_____

that a court may address an affirmative defense not raised in an answer if the defense was tried by express or implied consent of the parties).

*A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)). Therefore, the question we must answer is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care . . . ." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

Here, DCS filed a petition for an emergency protective order on April 20, 2020, alleging that Keira was dependent and neglected. That same day, the juvenile court entered an order granting the petition and removing Keira from Father's custody. The Department filed a separate petition for an emergency protective order on April 24, 2020, alleging that Kaylee was dependent and neglected. The court entered an order that same day granting the petition and removing Kaylee from Mother's custody. There is no dispute that the termination hearing did not begin until more than six months after both of these orders were entered. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)-(B). The first two elements have, therefore, been satisfied.

The conditions leading to the children's removal included drug use, domestic violence, lack of supervision, and environmental neglect. In the more than three years following the removal, Mother did very little to demonstrate that the children could ever be safely returned to her custody. A DCS caseworker testified that Mother completed a domestic violence course, but her sobriety remained a concern. For instance, on several occasions when DCS spoke with Mother on the phone, Mother was incoherent, her speech was slurred, or she would hang up and send erratic text messages, including one accusing a DCS caseworker of stealing her dog and owing her money.

One of the requirements of Mother's permanency plan was to complete a drug and alcohol assessment. Mother completed a drug and alcohol assessment through Renewal House, and that assessment recommended that she complete inpatient services or intensive out-patient treatment. Mother disagreed with the recommendation, claiming that she did not need treatment, and she requested another assessment from a different provider. Thereafter, Mother submitted an unapproved assessment that made no recommendations. When attempting to verify the assessment, DCS could not determine where it came from or the identity of the provider. The Department, therefore, deemed the assessment a "self-assessment" and informed Mother that she needed to complete another assessment. Mother never completed the recommendations from the initial assessment from Renewal House, and she never provided DCS with another assessment. She testified that she regularly attended Achieve Wellness for opiate addiction treatment and counseling, but she never provided DCS with any documentation about this treatment.

Mother repeatedly refused to submit to random drug screens and informed DCS caseworkers not to come to her home unannounced. Instead, Mother requested that caseworkers schedule the drug screens or do them at court hearings. On one occasion,

Mother asked to be drug screened at her place of employment. The Department accommodated her request, but Mother was not there when the DCS caseworker arrived. Mother completed a random drug screen in August 2022 that returned positive for amphetamines and buprenorphine. She claimed to have prescriptions for both substances, but she failed to provide any prescription to DCS until May 15, 2023, the third day of trial. The prescription she provided at trial, however, was an unverified printout. A pill count of a prescription bottle Mother also presented on the third day of trial showed that she was not taking her medication as prescribed.

In addition to Mother's continued substance abuse issues, "other conditions" persisted that prevented the safe return of the children to Mother's custody. Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). Following the removal, Mother accumulated several criminal charges. She was arrested for driving under the influence ("DUI") on May 13, 2020, and on May 5, 2021. Mother claimed she was under the influence of her prescribed medication both times. After pleading guilty to both DUI charges, she served two weeks in jail, was placed on supervised probation, lost her driver's license for a year, was required to complete an alcohol safety course, and was required to complete either one round of inpatient treatment or twelve to fourteen weeks of intensive outpatient treatment as a condition of her probation. Mother violated the conditions of her probation in October 2022 when she was charged with driving without a license, which resulted in her being incarcerated from December 2022 through March 2023.[6] After being released from jail in March 2023, Mother testified that her remaining charges had been "retired," but she had not completed the drug treatment that was a requirement of her probation. The status of her criminal charges, therefore, was unclear.

Mother's instability regarding employment and housing also persisted, preventing the children from being safely returned to her custody. Throughout the custodial episode, Mother failed to maintain employment or housing for any consistent period of time. At the time of trial, Mother testified that she was staying at different motels and housing she found on "Facebook Market." She stated that she had employment, but she had worked there for only a couple of months.

Given that Mother had approximately three years to remedy the conditions preventing reunification but failed to do so, it is unlikely these conditions would be remedied at an early date. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). Furthermore, the continuation of the parent and child relationship in this case would diminish the children's chances of integrating into a permanent home. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). The children's foster mother testified that the children had lived in her home for almost two years. The children were doing well and were happy in the foster home. They have bonded with the foster parents and call the foster parents "Mommy" and "Dad." The foster parents are interested in adopting the children if they become available

---

[6] This incarceration resulted in the lengthy continuance of the termination hearing.

for adoption. We conclude that DCS proved the existence of this termination ground by clear and convincing evidence.

### C. Failure to manifest an ability and willingness to personally assume custody

Finally, the trial court terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(14). This ground requires a party to prove two elements by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, a party must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Second, a party must prove that placing the children in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14).

To establish the first prong, the party seeking to terminate parental rights need only prove that a parent failed to manifest either an ability or a willingness to assume custody. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13-14 (Tenn. Ct. App. June 20, 2018)). "Ability focuses on the parent's lifestyle and circumstances[,]" and willingness focuses on the parent's attempts "to overcome the obstacles that prevent [him or her] from assuming custody or financial responsibility for the child." *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). Thus, a parent's mere desire to reunite with his or her child is insufficient to demonstrate an ability or a willingness. *In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019).

Here, Mother desired to reunite with the children, but her actions failed to demonstrate an ability or a willingness to assume custody or financial responsibility of them. At the time of trial, Mother had yet to address her substance abuse issues, which led to repeated DUI charges and incarceration for approximately a year. After being released from jail, Mother did not contact DCS for almost a month despite not having seen the children in six or seven months. Mother lacked stable housing or employment throughout the case. She changed jobs often and, as of trial, lived in motels or "Facebook Market" housing. Mother attended visits, but she repeatedly showed up late to the visits. During some of the visits, the caseworker stated that Mother appeared under the influence, slurring her words and hyper-fixating on things that required the visit supervisors to redirect Mother's attention to the children. The foster mother testified that, when she supervised some of the visits, Mother went to her car for an extended period of time rather than visiting with the children.

Regarding the second prong, the evidence in the record demonstrates that placing the children in Mother's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). "Substantial

harm" requires "'a real hazard or danger that is not minor, trivial, or insignificant'" and, "'[w]hile the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.'" *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). In analyzing this termination ground, we have previously identified several circumstances that support a substantial harm finding:

> By way of illustration, forcing a child to begin visitation with a near-stranger would make psychological harm sufficiently probable. *See In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (holding that substantial harm could be established when a child was removed from a home when very young and had nightmares out of fear of being removed from his foster family); *State v. C.H.H.*, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *9 (Tenn. Ct. App. May 21, 2002) (holding that removal from the child's current family and placement with a near-stranger could constitute substantial harm). Or placing a child with a parent who engaged in repeated criminal conduct that required incarceration would put a child at risk of substantial physical or psychological harm. *In re O.M.*, No. E2018-01463-COA-R3-PT, 2019 WL 1872511, at *4 (Tenn. Ct. App. Apr. 26, 2019) (quoting *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *15 (Tenn. Ct. App. June 20, 2018)). And parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence could lead to a conclusion of a risk of substantial harm. *In re Brantley O.*, No. M2019-01265-COA-R3-PT, 2020 WL 6253562, at *6 (Tenn. Ct. App. Oct. 22, 2020) (holding that the mother's continued struggle with drug addiction and her relationship with a registered sex offender presented a risk of substantial harm); *In re Piper B.*, No. M2017-00930-COA-R3-PT, 2018 WL 3954328, at *10 (Tenn. Ct. App. Aug. 17, 2018) (holding that the mother's failure to address her history of drug addiction, mental illness, and domestic abuse "create[d] a substantial hazard or risk of danger to the children's welfare that [wa]s not minor, trivial, or insignificant"); *In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at *18 (Tenn. Ct. App. May 8, 2018) (holding that the mother's failure to cut ties with the father who had a history of domestic violence led to a risk that was not "minor, trivial, or insignificant").

*In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021).

Given that Mother has yet to address her substance abuse issues, which has led to repeated criminal conduct requiring incarceration, and that she lacks stability due to her inconsistent employment and housing circumstances, we agree with the juvenile court's

- 10 -

finding that placing the children with her poses a risk of substantial harm to their physical and psychological welfare. We conclude that this ground for termination was proven by clear and convincing evidence.

## II. Best interest

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Mother's parental rights, we must next consider whether the trial court properly determined that termination of Mother's parental rights was in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* at 877. Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.*

When examining the best interest of the children in the termination of parental rights context, we are directed by statute to consider the nonexclusive factors listed in Tenn. Code Ann. § 36-1-113(i)(1). The statute enumerates factors that the court "shall consider," *In re Angela E.*, 303 S.W.3d at 251, but a court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The statute similarly does not call for a mechanical determination of each of the statute's factors; rather, the relevancy and weight of each factor will be unique to each case. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005). Therefore, in certain circumstances, the consideration of one factor may be determinative. *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). However, this does not relieve a court of its duty to consider each factor and, even in cases where one factor is outcome determinative, the court must consider all factors and relevant proof that a party offers. *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. Ct. App. Tenn. 2015). Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

Factor A concerns "[t]he effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's

minority" Tenn. Code Ann. § 36-1-113(i)(1)(A). Termination of Mother's parental rights will have a positive impact on the children's need for stability and continuity of placement. They bonded with the foster parents and have accepted them as "Mommy" and "Dad." The foster mother testified that she and her husband helped the children resolve their behavioral and speech issues, took them to medical appointments and therapy, and ensured all their milestones and needs were met. *See id.* § 36-1-113(i)(1)(H) ("Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent."). The children also have emotionally significant relationships with the foster parents' friends and family, whom the children consider grandparents, aunts, uncles, and cousins. *See id.* § 36-1-113(i)(1)(I) ("Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage.").

In contrast, returning the children to Mother would have a detrimental effect on them. Although Mother may have a bond with the children, it is neither healthy nor secure. She failed to maintain regular visitation, and at the time of trial, Mother had not seen the children in seven months due to her incarceration and failure to contact DCS. Mother proved to continuously lack stability by not maintaining consistent employment and/or housing. She failed to attend an IEP meeting for Keira that resulted in services being delayed, and she then never asked how Keira was progressing with her IEP or speech therapy. Furthermore, she never asked about either of the children's educational progress. During visits, Mother paid significantly more attention to Keira, and a caseworker supervising one of the visits had to advise Mother not to allow Keira to put a crystal in her mouth because it was a choking hazard. Mother has three other children who were removed from her custody due to the same issues that led to the removal of the children at issue here. *See id.* § 36-1-113(i)(1)(C), (D), (E), (O), (Q) ("Whether the parent has demonstrated continuity and stability in meeting the child's basic material, education, housing, and safety needs," "[w]hether the parent and child have a secure and healthy parental attachment, and if no, whether there is a reasonable expectation that the parent can create such attachment," "[w]hether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child," "[w]hether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult," and "[w]hether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs.").

Next, under Factor J, we consider "[w]hether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care

- 12 -

for the child in a safe and stable manner." *Id.* § 36-1-113(i)(1)(J).  Nothing in the record shows that Mother made any lasting changes that would make it safe and beneficial for the children to be in her home.  Mother has not addressed her substance abuse issues and has accrued criminal charges since the children's removal.  She has also repeatedly refused to cooperate with DCS's requests that she submit to random drug screens and that she complete the recommendations of the drug and alcohol assessment completed by Renewal House.  *See id.* § 36-1-113(i)(1)(K), (M) ("Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions," and "[w]hether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest.").

Although Mother has been employed at various times during the custodial episode, she failed to pay any child support.  *See id.* § 36-1-113(i)(1)(S).  Lastly, Mother's mental fitness "would be detrimental to the child or [would] prevent [Mother] from consistently and effectively providing safe and stable care and supervision of the child."  *See id.* § 36-1-113(i)(1)(T).  Mother reported to DCS that she was a "prophet," and she sometimes sent erratic text messages accusing DCS caseworkers of acts such as stealing her dog or owing her money.  As a result, DCS added a requirement to Mother's permanency plan requiring her to complete a mental health assessment.  Mother never completed such assessment.

The remaining factors do not weigh in favor of or against termination. Thus, based on the foregoing, we conclude that clear and convincing evidence establishes that termination of Mother's parental rights is in the child's best interest.

CONCLUSION

The judgment of the trial court is affirmed.  Costs of this appeal are assessed against the appellant, Tara J., for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

- 13 -